UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

BRET LEE BROCKUS,

    Plaintiff,

v.                                                          CASE NO. 2:18-cv-451-FtM-MCR

COMMISSIONER OF THE SOCIAL
SECURITY ADMINISTRATION,

    Defendant.
_____/

## MEMORANDUM OPINION AND ORDER[1]

**THIS CAUSE** is before the Court on Plaintiff's appeal of an administrative decision denying his applications for a period of disability, disability insurance benefits ("DIB"), and supplemental security income ("SSI"). Following an administrative hearing held on January 19, 2017, the assigned Administrative Law Judge ("ALJ") issued a decision, finding Plaintiff not disabled from April 30, 2011, the alleged disability onset date, through August 21, 2017, the date of the decision.[2] (Tr. 12-25, 35-74.) Based on a review of the record, the briefs, and the applicable law, the Commissioner's decision is **REVERSED and**

---

[1] The parties consented to the exercise of jurisdiction by a United States Magistrate Judge. (Doc. 12.)

[2] Plaintiff had to establish disability on or before December 31, 2015, his date last insured, in order to be entitled to a period of disability and DIB. (Tr. 15; *but see* Tr. 91 & 117 (noting that Plaintiff's date last insured was December 31, 2014).)

1

**REMANDED**.

## I.     Standard

The scope of this Court's review is limited to determining whether the Commissioner applied the correct legal standards, *McRoberts v. Bowen*, 841 F.2d 1077, 1080 (11th Cir. 1988), and whether the Commissioner's findings are supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390 (1971). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004). Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995); *accord Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (stating that the court must scrutinize the entire record to determine the reasonableness of the Commissioner's factual findings).

## II.     Discussion

Plaintiff argues that the ALJ did not give legally sufficient reasons to reject

the opinions of his pain management specialist, Dr. Scott Fuchs, from March 10 and March 21, 2016, and the opinions of his primary care physician, Dr. Francis Harrington, from July 31, 2014. Plaintiff also argues that the ALJ's credibility finding does not follow the Agency's two-step analysis. The Commissioner responds that substantial evidence and proper legal analysis support the ALJ's decision.

### A. The ALJ's Decision

At step two of the five-step sequential evaluation process, the ALJ found that Plaintiff had the following severe impairments: congenital fusion of the thoracic spine with kyphosis, degenerative disc disease of the thoracic spine, sciatica, and degenerative changes of the cervical spine. (Tr. 17.) At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 18.)

The ALJ then found that Plaintiff had the residual functional capacity ("RFC") to perform sedentary work, "except he [could] stand two hours in an eight-hour workday; walk one hour in an eight-hour workday; and stoop[] not more than rarely." (*Id.*) In making this finding, the ALJ discussed Plaintiff's complaints and daily activities, the treatment notes, the objective medical records, and the opinion evidence. (Tr. 18-23.)

The ALJ addressed Plaintiff's complaints as follows:

3

> The claimant reported having difficulty standing or sitting for long periods. He stated it hurts to bend, squat, knee [sic] or reach. He alleges he could lift than [sic] 20 pounds and walk for ½ hour. He has trouble getting up from a squatting position. He can walk 1 ½ to 2 miles before needing to rest (Exhibit B4E).
>
> . . . He indicated that he attempted to work in 2014, unloading trucks, but he could not continue due to pain. He stated that he worked part time, as a seasonal employee, for Target collecting carts, but at times, this would hurt his back or he would trip over a curb. He stated that he would leave work early or would miss full days, calling in 1-2 times a week, or he would be out of work for a week.
>
> The claimant alleges pain in his whole back, neck and tailbone that radiates down his bilateral legs. He can lift and carry 10 pounds, sit 15-20 minutes, stand 15-20 minutes, and walk less than 1/4 of mile. He indicated that in an eight-hour workday, he could sit for two hours and walk about the same. He stated he could not stoop. He reported having daily pain, ranging 7-8/10 in severity, with medications. He uses a Fentanyl patch, which he changes every 3 days, and Percocet for pain. He indicated medications help to a point, but he experiences side effects including confusion, appetite changes, and mood swings.
>
> . . . He helps with household chores, when he can. He does the dishes 2-3 times a week. He does not drive, but gets rides from his girlfriend or his mother. He takes public transportation 1-2 times a week, with difficulty. He shops with his girlfriend and uses a scooter when he is in the store.

(Tr. 19.)

The ALJ found that although Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, Plaintiff's statements regarding the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record. (Tr. 22.) The ALJ explained:

4

> The record reflects that, despite his allegations and impairments, the claimant has performed a generally normal range of functional abilities, which is inconsistent with a finding of disability. Information contained on an October 8, 2014 Function Report, indicates the claimant walks and rides his bike. He cooks, does laundry, waters the plants, and does some basic cleaning. He has no difficulty performing personal care. He goes outside every day. He goes out alone, shops in stores 3-4 times a month, and goes fishing once a month. He reads and watches TV almost every day with no problems. He talks on the phone, in person and on the computer daily (Exhibit B4E). He noted similar activities during his hearing.
>
> Moreover, the claimant demonstrated no evidence of pain or discomfort while testifying at the hearing. While the hearing was short-lived and cannot be considered a conclusive indicator of the claimant's overall level of pain on a day-to-day basis, the apparent lack of discomfort during the hearing is given some slight weight in reaching the conclusion regarding the credibility of the claimant's allegations and the claimant's [RFC]. Nonetheless, he did testify that he was on a Fentanyl patch and using Percocet for breakthrough pain.
>
> Even if the claimant's daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical conditions, as opposed to other reasons, in view of the relatively benign medical evidence and other factors discussed in this decision. Of particular interest are the minimal findings on examinations. His treatment has been routine and conservative. He has not required inpatient, partial or urgent care for his medical issues. The record does not document any medication side effects that have not been remedied and the claimant did not testify that he experiences any current medication side effects. In addition, the medical evidence, and in particular, the clinical signs and objective evidence contained in treatment notes and reports do not reveal limitations of function consistent with a complete inability to perform all work activity.

(*Id.*)

Further, the ALJ addressed the treatment records from Dr. Scott Fuchs.[3]
(Tr. 20-21.) The ALJ weighed the opinion evidence from Dr. Scott Fuchs as follows:

> The March 10, 2016 opinion of treating source Scott Fuchs, D.O., in Exhibit B9F, is assigned little weight. Dr. Fuchs opined that in an 8-hour workday, the claimant could sit for 3 hours, stand for 2 hours, walk for 1 hour and work for 3 hours; lift and carry 10 pounds occasionally; and never squat, crawl, stoop, crouch or kneel. The opinion overestimates the claimant's limitations in light of the limited examination findings (Exhibits B4F, 11F). Dr. Fuchs additionally opined on March 21, 2016 that the claimant was unable to participate in a work program (Exhibit B10F). This opinion is assigned no weight because it does not provide a function-by-function analysis of the claimant's abilities. Moreover, the opinion is not supported by the objective medical evidence of record as a whole.

(Tr. 23.)

The ALJ also addressed records from "Dr. Harrington," including the opinion from October 3, 2016 that Plaintiff was disabled from "kyphosis and

---

[3] The record also includes an opinion from Dr. *Louis* Fuchs, which the ALJ addressed as follows:
> The undersigned has considered the March 4, 2017 opinion of medical expert, Louis Fuchs, D.O., in Exhibit B17F. Based on his review of the entire record in evidence, including the treatment notes of the claimant's treating physician in Exhibits B4F and B11F, Dr. Fuchs opined the claimant was able to sit, stand and walk for 1-2 hours, at one time; lift/carry 10 pounds continuously and 20 pounds occasionally; and occasional[ly] stoop, crouch, bend and kneel. The expert opined the claimant had no limits regarding stairs or ramps, but that he was unable to climb scaffolds. Dr. Fuchs further opined the claimant could have occasional exposure to severe heat and cold, but was unable to be exposed to vibrations. The opinion of the medical expert is [sic] does not take into consideration the claimant's subjective complaints of pain, and therefore, is assigned partial weight.

(Tr. 23.)

scoliosis." (Tr. 21.) However, the ALJ did not seem to weigh Dr. Jane M. Harrington's opinion from October 3, 2016. Rather, the ALJ gave "little weight" to Dr. Francis Harrington's opinion that Plaintiff was unable to work. (Tr. 22.) The ALJ reasoned: "The opinion fails to outline any specific work-related limitations. Moreover, it is a conclusory statement on an issue reserved to [the] Commissioner and it is not supported by the objective medical evidence of record or the minimal clinical signs." (*Id.*)

The ALJ concluded that "the medical record as a whole" supported the conclusion that Plaintiff could perform the "physical requirements of work at the sedentary exertional level, with the acknowledged limitations, considering his severe impairments." (Tr. 23.) The ALJ noted that he had also considered the non-severe impairments in assessing the RFC, but found "no specific functional limitations beyond those outlined" in the decision. (*Id.*) Ultimately, the ALJ concluded that there were jobs existing in significant numbers in the national economy that Plaintiff could perform. (Tr. 24.)

### B. Relevant Medical Opinions

#### 1. Dr. Francis E. Harrington, Jr.

On July 31, 2014, Dr. Francis E. Harrington, Jr., a treating physician, completed a Functional Capacity Letter, opining that Plaintiff was "[u]nable to work at this time" due to low back pain, that his impairments would be expected to last at least 12 months, that his prognosis was fair, and that he would require

7

an accommodation for sitting/standing/shifting positions at will. (Tr. 584.)

### 2. Dr. Jane M. Harrington

On October 3, 2016, Dr. Jane M. Harrington, a treating physician, noted that Plaintiff was "disabled" from "kyphosis and scoliosis." (Tr. 628.) In the same note, the doctor stated that the dose of the Fentanyl Patch would be doubled to 50 mg, every three days, in order to attain pain control with long-acting medication and decrease the amount of immediate-release pain medication to 60 tablets only for breakthrough pain. (Tr. 628-29.)

On November 2, 2016, Dr. Jane M. Harrington again noted that Plaintiff was "disabled." (Tr. 630.) On that day, she again increased the dose of the Fentanyl Patch to 75 mg, every three days, and prescribed Percocet 7.5/325 mg for breakthrough pain. (*Id.*)

### 3. Dr. Scott Fuchs

On March 10, 2016, Dr. Scott Fuchs, a treating physician, completed an RFC Questionnaire, opining that in an eight-hour workday, Plaintiff could sit for three hours, stand for two hours, walk for one hour, and work for three hours. (Tr. 618.) He further opined that due to spine fusion and degeneration, Plaintiff could occasionally lift and/or carry up to ten pounds; that he could occasionally bend, climb, and reach above; that he could never squat, crawl, stoop, crouch, and kneel; that due to his narcotic pain medications, he could not tolerate any exposure to unprotected heights, marked temperature changes, noise, moving

machinery, or driving automotive equipment, but he could be continuously exposed to dust, fumes, and gases. (Tr. 618-19.) Dr. Scott Fuchs opined that Plaintiff's pain was moderate to severe, and it was objectively shown by joint and spinal deformity, muscle spasms, and X-rays. (Tr. 619.)

On March 10, 2016, Dr. Scott Fuchs also completed a Medical Statement Regarding Low Back Pain for Social Security Disability Claim. (Tr. 621.) He reaffirmed that Plaintiff's pain was moderate to severe, and opined that Plaintiff could stand/sit for 15 minutes at one time, work for two to three hours per day, lift 10 pounds occasionally and none frequently, and never bend or stoop. (*Id.*) Dr. Scott Fuchs noted that examination or testing revealed the following: neuro-anatomic distribution of pain, limitation of motion of the spine, need to change position more than once every two hours, and chronic non-radicular pain and weakness. (*Id.*)

On March 21, 2016, Dr. Scott Fuchs wrote a letter, stating in relevant part: "Bret Brockus has been under my care for an ongoing chronic spinal condition. This condition is permanent and has had limited progress. He cannot participate in the work program requested by [the] Department of Children and Families." (Tr. 623.)[4]

---

[4] In some of his treatment notes, Dr. Scott Fuchs wrote that he had filled out disability paperwork for Plaintiff on May 4, 2016. (*See, e.g.*, Tr. 670.) However, it does not appear that any such paperwork from that date is in the record.

### 4. Dr. Louis A. Fuchs

On March 4, 2017, Dr. Louis Fuchs, an impartial medical expert contracted by the Social Security Administration ("SSA"), responded to the ALJ's interrogatories based on a review of the evidence. (Tr. 732-36.) Under impairments, Dr. Louis Fuchs listed chronic LS myofascitis and cervical myofascitis, noting "multiple neuro exams [within normal limits] while spinal motions decreased somewhat." (Tr. 733.) The doctor supported his opinion by citing to records from August 19, 2013; January 16, 2014; May 21, 2014; September 6, 2014; March 17, 2015; September 22, 2015; May 31, 2016; and August 26, 2016. (*Id.*) Dr. Louis Fuchs opined that Plaintiff's impairments, either separately or in combination, did not meet or equal any impairment described in the Listings, because multiple exams, neuro-wise, were within normal limits. (Tr. 734.)

Dr. Louis Fuchs was also asked to identify any functional limitations or restrictions resulting from Plaintiff's impairments. (Tr. 735.) He responded that Plaintiff could sit, stand, and/or walk at one time at least 1-2 hours; lift and/or carry 10 pounds continuously and 20 pounds occasionally; stoop, crouch, bend, and kneel occasionally; climb stairs or ramps without limitation, but never scaffolds; and could be exposed to severe heat/cold occasionally, but never to vibrations. (*Id.*)

## C. Analysis

The Court agrees with Plaintiff that the ALJ's evaluation of the medical opinion evidence warrants a remand. As stated previously, in an RFC Questionnaire completed on March 10, 2016, Dr. Scott Fuchs opined, in part, that in an eight-hour workday, Plaintiff could only sit for three hours, stand for two hours, walk for one hour, work for three hours, and lift and/or carry up to ten pounds occasionally. (Tr. 618.) In a Medical Statement completed the same day, Dr. Scott Fuchs opined, in part, that Plaintiff could sit/stand for 15 minutes at a time, work for two to three hours per day, and lift 10 pounds occasionally. (Tr. 621.) He stated that Plaintiff's pain was moderate to severe and was objectively supported by examinations and testing, which revealed joint and spinal deformity, muscle spasms, limitation of motion of the spine, chronic non-radicular pain and weakness, and anatomic distribution of pain, among others. (Tr. 619, 621.)

The ALJ assigned "little weight" to the March 10, 2016 opinions from Dr. Scott Fuchs and explained that Dr. Fuchs overestimated Plaintiff's limitations in light of the limited examination findings. (Tr. 23.) Also, the ALJ gave "no weight" to Dr. Fuchs's opinion from March 21, 2016 that Plaintiff could not participate in the work program requested by the Department of Children and Families due to his permanent condition and limited progress (Tr. 623), because the opinion did not provide a function-by-function analysis of Plaintiff's abilities and was not

supported by the objective medical evidence of record as a whole (Tr. 23).

Even if the ALJ was correct that Dr. Fuchs's opinion from March 21, 2016 did not provide a function-by-function analysis of Plaintiff's abilities, the ALJ improperly rejected Dr. Fuchs's opinions from March 10, 2016 and March 21, 2016 based on allegedly limited examination findings and other objective medical evidence. First, the ALJ's statement that Plaintiff's examination findings were limited is not supported by substantial evidence.

Even prior to Plaintiff's alleged disability onset date, his examinations were positive for, *inter alia*, tenderness in the lumbar and thoracic areas, decreased range of motion, and joint pain. (*See, e.g.*, Tr. 425.) After the onset date, Plaintiff's posture was kyphotic and leaning forward. (Tr. 343-44.) He continued to have thoracic and lumbar tenderness and pain, as well as moderate cervical tenderness and spasm, and a positive Quadrant Test. (*Id.*) There was a large sacral bone marrow change on an MRI, a large myofascial component of the thoracic spine, likely secondary to kyphosis and congenital fusion at T10-11, and an increase in Plaintiff's pain/symptoms with spinal extension. (*Id.*) On October 2, 2012, there was numbness/tingling in Plaintiff's extremities and pain with straight leg raising test bilaterally. (Tr. 441-42.) In June 2013, Plaintiff underwent a surgical repair of his left biceps tendon, which had been ruptured. (Tr. 547, 553; *see also* Tr. 479 (noting a swollen and painful left elbow with no palpable

biceps tendon, pain and weakness with pronation, sprains and strains of the shoulder and upper arm, rotator cuff, and joint pain).)

In January 2014, there was a paraspinal muscle spasm, lumbar tenderness, thoracic pain, and mild left straight leg raising on examination, prompting a referral to pain management. (Tr. 473-74.) A number of physical examinations, including those from February–March 2014, November–December 2015,[5] and January–August 2016, indicated that Plaintiff appeared to be in moderate pain and reported a pain level of 7 to 9 on a scale of 0 to 10,[6] had decreased range of motion and pain with back extension and lateral flexion, had a spasm of the left and right thoracic paraspinal muscles, had advanced thoracic kyphosis which might be causing a somewhat increased lumbar lordosis, had pain upon palpation of the thoracic spine bilaterally, had some radiation of pain

---

[5] Plaintiff's examinations in June and October 2014 were normal. (Tr. 572-74, 576-78.) However, on September 6, 2014, Plaintiff presented to the Emergency Department, complaining of exacerbation of his chronic back pain and localized paresthesias, and reporting no relief after taking his usual dose of Percocet. (Tr. 493.) He complained of right hand and bilateral lower extremity tingling, which improved after taking a muscle relaxant. (*Id.*) He had tenderness over the paraspinal muscles in the lower thoracic and upper lumbar areas. (Tr. 494.) During that Emergency Room visit, Plaintiff requested a short course of Percocet. (*Id.*)

Although between December 2014 and September 2015 some of Plaintiff's examinations were noted to be generally unremarkable, he was nevertheless continued on pain management, with Percocet and other narcotic pain medications being refilled on a monthly basis. (Tr. 596-610, 625-27 (noting that Plaintiff was taking Oxycodone-Acetaminophen 10-325 mg every four hours and MS Contin 30 mg twice a day, among other medications).)

[6] On December 16, 2015, Plaintiff reported a pain level of 4. (Tr. 715-16.)

into the right lower extremity, even though the majority of his pain was axial spine pain, and there was "considerable associated muscle spasms." (Tr. 484-85, 489, 633-35, 639-41, 655-57, 662-63, 668-69, 675-76, 681-83, 688-89, 702-03, 708-09, 715-16.) These records also indicated that Plaintiff had "congenital fusion of the lower thoracic spine which [was] causing an increased thoracic kyphosis which [was] contributing to facet syndrome and myofascial pain." (Tr. 484-85, 489, 633-35, 639-41, 655-57, 664, 670, 677, 683, 690, 704, 710, 716.)

During multiple office visits, Dr. Scott Fuchs noted that Plaintiff's sciatica, degeneration of thoracic disc, and shoulder pain, among others, were contributing to Plaintiff's complaints. (*See, e.g.*, Tr. 635-36, 641-42.) Plaintiff's worst pain was in his lower back, which was reported as an 8 or 9, was radiating to his legs, and was "always exacerbated with over [sic] activities like standing and walking for too long." (Tr. 637.) It was noted that Plaintiff had a "known abnormal fusion in the lower thoracic spine leading to secondary kyphosis" and that he could "be very uncomfortable at times from pain." (*Id.*)

Further, the results of the diagnostic testing were not inconsistent with the treatment notes.[7] (*See* Tr. 459 (stating that the thoracic X-rays from October 3,

---

[7] The pre-onset objective test results were generally minimal. (*See* Tr. 425 (stating that the lumbar X-ray from January 26, 2010 showed congenital fusion at T10 and T11 and otherwise minimal degenerative changes); Tr. 420 (stating that the lumbar MRI from February 3, 2010 showed mild lower lumbar facet arthropathy and abnormal signal in the right sacral area); Tr. 426 (stating that a CT scan from February 4, 2010
(continued...)

2012 showed "[a]nkylosis of the T10-11 vertebra with kyphosis" and "[s]pondylosis with disk degeneration[,] most notably involving the lower thoracic spine"); Tr. 461 (stating that the cervical X-rays from October 3, 2012 showed "[d]egenerative changes at C5-6 with minor neural foraminal stenosis"); Tr. 457 (stating that the lumbar X-rays from October 3, 2012 showed that "[t]he T10 and T11 vertebral bodies appear[ed] to be at least partially fused," there was no definite spondylolysis or spondylolisthesis, and there was no acute compression deformity); Tr. 481 (stating that the left elbow MRI from June 11, 2013 showed: "1. Complete tear of the biceps tendon from the radial tuberosity with retraction proximally of 3.5 cm. Extensive edema and probable hemorrhage surrounding the retracted tendon. The retracted tendon is significantly edematous and inflamed and swollen. 2. Mild tendinopathic changes in the common extensor tendon"); Tr. 549 (stating that the chest X-rays from June 21, 2013 showed mild hyper-expansion and increased thoracic kyphosis with a lower intervertebral disk space narrowing and partial fusion).)

The records also show that Plaintiff had failed conservative treatment, such as non-opiate medications, adjuvant therapy, interventional pain assessment, and

---

[7](...continued)
showed "[a]pparent congenital block vertebra of T10 and T11 resulting in a slight kyphotic deformity at that level and with associated moderately severe degenerative disc disease at the T9-T10 level and at the T11-T12 level below").)

physical therapy[8] (Tr. 485-86, 691, 698), and even his narcotic pain medications, taken at increased doses and sometimes decreased intervals, were not particularly helpful in relieving his symptoms. (*See* Tr. 346 ("[Patient] states [on January 10, 2011 that] he continues to take Percocet 6-7 daily. [Patient] states he understands that he is taking more than prescribed."); Tr. 344 ("[Patient] states [on May 9, 2011 that] he continues to take Percocet 'every 4-6 hours, sometimes one in between, sometimes two at a time.' [Patient] states he ran out of medications 4-5 days ago."); Tr. 343 (stating that, as of August 8, 2011, Plaintiff was taking two tablets of Percocet 7.5-325 mg, 3-4 times a day, and was requesting a higher dose); Tr. 472 (stating that, as of June 11, 2013, Plaintiff was taking Percocet 10-325 mg); Tr. 474 (stating, on January 16, 2014, that Plaintiff was prescribed Medrol dose pack and an injection); Tr. 490 (stating, on February 24, 2014, that Plaintiff would be starting a trial of Percocet 10 mg, three times a day as needed for pain, and Flexeril 10 mg, twice a day as needed for spasms); Tr. 485-86 (noting, on March 25, 2014, that Percocet 10mg was increased to four times a day as needed); Tr. 631 (stating, on November 11, 2015, that Morphine

---

[8] Plaintiff has also received lumbar epidural steroid injections, has used a TENS unit daily, and has been given exercises to improve his posture and pain. (Tr. 343-44, 346, 400-01.) Although Plaintiff may have refused physical therapy on October 17, 2012 (Tr. 440), there are several references throughout the record, including on February 24, 2014 and August 26, 2016, that Plaintiff had been without health insurance for the "last couple of years." (*See* Tr. 487, 657 (reporting that Plaintiff did not have health insurance and could not afford his blood pressure medications).)

16

and Percocet have not been really helpful); Tr. 713 (stating, on December 16, 2015, that the "hydromorphone was ineffective and cause[d] side effects of nausea, headaches and constipation," and Morphine and Percocet had "not been really helpful"); Tr. 679 (reporting, on May 4, 2016, that Plaintiff "had been taking his regular pain medications with not much help"); Tr. 673 (reporting, on May 31, 2016, that Plaintiff "had been taking his regular pain medications with not much help," and samples of Voltaren gel were provided, which had been helpful); Tr. 666 (reporting, on June 28, 2016, that the Fentanyl patch "kept the pain better a little bit but [Plaintiff] was still in pain and it was also more expensive," but he was "willing to do one more month"; during that visit, Plaintiff requested a refill of his chronic pain medications and denied side effects); Tr. 653-55 (reporting, on August 26, 2016, that Plaintiff's pain medication regimen, which included Percocet 10/325 mg and a Fentanyl patch, was "effective at taking the edge off of his pain without side effects," but still reporting a pain level of 8 and noting that Plaintiff appeared to be in moderate pain); Tr. 628-29 (stating, on October 3, 2016, that the dose of the Fentanyl Patch was doubled to 50 mg, every three days, in order to attain pain control with long-acting medication and decrease the amount of immediate-release pain medication to 60 tablets only for breakthrough pain); Tr. 630 (stating, on November 2, 2016, that the dose of the Fentanyl Patch was increased to 75 mg, every three days, and Plaintiff was prescribed Percocet

17

7.5/325 mg for breakthrough pain).)

Based on the foregoing, the Court cannot conclude that the ALJ's evaluation of Dr. Scott Fuchs's opinion is supported by substantial evidence. Similar to his evaluation of Dr. Scott Fuchs's opinion, the ALJ accorded "little weight" to Dr. Francis Harrington's opinion that Plaintiff was unable to work, partly because it was "not supported by the objective medical evidence of record or the minimal clinical signs." (Tr. 22.) However, as shown above, it seems that the ALJ did not adequately consider the medical evidence as a whole.

In addition, there was an opinion by Dr. *Jane M.* Harrington from October 3, 2016, which the ALJ mentioned (Tr. 21), but never weighed, and another opinion by the same doctor from November 2, 2016, stating that Plaintiff was "disabled," which the ALJ never mentioned. Notably, there were two treating physicians with the last name "Harrington" and two other physicians (one treating and one non-examining) with the last name "Fuchs"; yet, it is unclear whether the ALJ adequately considered each of these doctors' opinions separately, as well as in combination, when determining the RFC. To the extent the opinions were consistent with one another, the ALJ was required to take that into consideration in weighing them. *See* 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4). However, on this record, the Court is left to speculate whether that happened here.

As such, this case will be remanded with instructions to the ALJ to re-

consider the medical opinions of record. In light of this conclusion and the possible change in the RFC assessment, it is unnecessary to address Plaintiff's argument regarding the ALJ's credibility findings. *See Jackson v. Bowen*, 801 F.2d 1291, 1294 n.2 (11th Cir. 1986) (per curiam); *Freese v. Astrue*, 2008 WL 1777722, at *3 (M.D. Fla. Apr. 18, 2008); *see also Demenech v. Sec'y of the Dep't of Health & Human Servs.*, 913 F.2d 882, 884 (11th Cir. 1990) (per curiam).

Accordingly, it is **ORDERED**:

1. The Commissioner's decision is **REVERSED** and **REMANDED** pursuant to sentence four of 42 U.S.C. § 405(g), with instructions to the ALJ: (a) to re-consider the medical opinions of record, explain what weight they are being accorded, and the reasons therefor; (b) to reconsider his credibility findings; (c) to re-evaluate Plaintiff's RFC assessment, if necessary; and (d) to conduct any further proceedings deemed appropriate.

2. The Clerk of Court is directed to enter judgment accordingly, terminate any pending motions, and close the file.

3. In the event that benefits are awarded on remand, any § 406(b) or § 1383(d)(2) fee application shall be filed within the parameters set forth by the Order entered in *In re: Procedures for Applying for Attorney's Fees Under 42 U.S.C. §§ 406(b) & 1383(d)(2)*, Case No.: 6:12-mc-124-Orl-22 (M.D. Fla. Nov. 13, 2012). This Order does not extend the time limits for filing a motion for attorney's

fees under the Equal Access to Justice Act, 28 U.S.C. § 2412.

**DONE AND ORDERED** at Jacksonville, Florida, on September 17, 2019.

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

Counsel of Record